1  Cheryl Hamer Mackell, Esq. (112933) -
   **POMERANTZ HAUDEK BLOCK**
2  **GROSSMAN & GROSS LLP**
   840 Malcolm Road
3  Burlingame, CA 94010
   Telephone: (415) 241-1480
4  Facsimile: (800) 211-5422

5  Michael M. Buchman, Esq.
   J. Douglas Richards, Esq.
6  **POMERANTZ HAUDEK BLOCK**
   **GROSSMAN & GROSS LLP**
7  100 Park Avenue
   New York, New York 10019
8  Telephone: (212) 661-1100
   Facsimile: (212) 661-8665

9

10  *Attorneys for Plaintiff and the Class*     CV  08     0308

11

12              **UNITED STATES DISTRICT COURT**

13      **IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA**

14

15  **JUDAH M. FEIGENBAUM,**            Case No._____
    individually and on behalf of all
16  others similarly situated,          **CLASS ACTION COMPLAINT**

17              Plaintiff,              **COMPLAINT FOR VIOLATIONS**
                                        **OF THE SHERMAN ANTITRUST**
        vs.                            **ACT 15 U.S.C. § 1**
18  **AIR NEW ZEALAND,**
    **ALL NIPPON AIRWAYS,**             **JURY TRIAL DEMANDED**
19  **CATHAY PACIFIC AIRWAYS,**
    **CHINA AIRLINES,**
20  **EVA AIRWAYS,**
    **JAPAN AIRLINES**
21  **INTERNATIONAL,**
    **MALAYSIA AIRLINES,**
22  **NORTHWEST AIRLINES,**
    **QANTAS AIRWAYS,**
23  **SINGAPORE AIRLINES,**
    **THAI AIRWAYS, UNITED**
24  **AIRLINES**
              Defendants.
25

26

27

28

**Class Action Complaint**

1                                **TABLE OF CONTENTS**

2                                                                           **Page**

3  I.    NATURE OF THE ACTION .................................... 3

4  II.   JURISDICTION AND VENUE ................................. 4

5  III.  PARTIES ................................................ 5

6        A.    PLAINTIFFS ....................................... 5
             B.    DEFENDANTS ...................................... 5
7             C.    UNNAMED CO-CONSPIRATORS ......................... 7

8  IV.   TRADE AND COMMERCE ..................................... 7

9  V.    CLASS ACTION ALLEGATIONS ............................... 7

10 VI.   FACTUAL ALLEGATIONS MARKET ............................. 9

11 VII.  DEFENDANTS AND THE PASSENGER FLIGHT MARKET ......... 10

12 VII.  TRADE ORGANIZATIONS ................................... 14

13 VIII. ADMISSIONS BY CO-CONSPIRATORS ......................... 23

14 IX.   FRAUDULENT CONCEALMENT ............................... 24

15 X.    COUNT I ............................................... 25

16 XI.   COUNT II .............................................. 26

17 XII.  PRAYER FOR RELIEF ..................................... 27

18 XIII. JURY TRIAL DEMAND ..................................... 28

19

20

21

22

23

24

25

26

27

28

**Class Action Complaint**                                              ii

1  Plaintiff Judah M. Feigenbaum, on behalf of himself and all others similarly
2  situated, hereby brings this action for treble damages and injunctive relief under
3  the federal antitrust laws of the United States, Section 1 of the Sherman Antitrust
4  Act of 1890, 15 U.S.C. § 1 ("Sherman Act") and Sections 4 and 26 of the Clayton
5  Antitrust Act of 1914, 15 U.S.C. §§ 15, 26 ("Clayton Act") against Defendants.
6  Plaintiff complains and alleges upon information and belief except as to those
7  paragraphs applicable to the named Plaintiff, which are based on personal
8  knowledge, as follows:

9  ## NATURE OF THE ACTION

10  1.  This is an antitrust class action arising from a global conspiracy
11  among certain airlines to fix, raise, maintain, and/or stabilize prices for long haul
12  passenger transpacific flights to and from the United States ("Passenger Air
13  Transportation"), and for fixed fuel surcharges on this transportation ("Fuel
14  Surcharges") in violation of Section 1 of the Sherman Act. Fuel surcharges are
15  fees charged to passengers by airlines purportedly to compensate the airlines for
16  increased fuel costs.

17  2.  Plaintiff, on behalf of all persons and entities that purchased
18  Passenger Air Transportation, to and from the United States, from any of the
19  Defendants and their co-conspirators or any predecessor, subsidiary, or affiliate of
20  each, at any time during the period from 2004 to August 2007 (the "Class
21  Period"), brings this action to recover treble damages and injunctive relief.

22  3.  At all times relevant herein, Defendants provided air transportation
23  services and sold Passenger Air Transportation, and charged fixed Fuel Surcharges
24  on that transport, to airline passengers in the United States and throughout the
25  world, including but not limited to flights to and from Los Angeles and to and
26  from San Francisco, California. Los Angeles International Airport ("LAX") and
27  San Francisco International Airport ("SFO") are considered the international U.S.
28  gateways to Asian and Pacific countries.

1      4.     As further alleged herein, during at least the Class Period, Defendants

2 agreed, combined, and/or conspired with each other to fix, raise, maintain, and/or

3 stabilize the prices of Passenger Air Transportation and Fuel Surcharges thereon.

4 As a result of Defendants' unlawful conduct and conspiracy, Plaintiff and the other

5 members of the Class paid artificially high prices for Passenger Air Transportation

6 and Surcharges, and have been damaged as a direct and proximate result thereof.

7                        **JURISDICTION AND VENUE**

8      5.     This Complaint is brought under Sections 4 and 16 of the Clayton

9 Act, 15 U.S.C. §§ 6(a), 15 and 26, to obtain injunctive relief and to recover treble

10 damages and the costs of this suit, including reasonable attorneys' fees, against

11 Defendants for the injuries sustained by Plaintiff and the members of the Class by

12 reason of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

13      6.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§

14 1331 and 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

15      7.     This Court has in personam jurisdiction over each of the Defendants

16 because each was engaged in an illegal price-fixing scheme and conspiracy that

17 was directed at and/or caused injury to persons and entities residing in, located in,

18 or doing business in the Northern District of California and throughout the United

19 States. Defendants' conduct had a direct, substantial and reasonably foreseeable

20 effect on U.S. commerce.

21      8.     Venue is proper in this judicial district pursuant to 15 U.S.C. § 22 and

22 28 U.S.C. § 1391(b), (c), and (d) because during the Class Period many of the

23 Defendants resided, transacted business, were found, or had agents in this district,

24 and because a substantial part of the events giving rise to Plaintiff's claims

25 occurred, and a substantial portion of the affected trade and commerce described

26 below has been carried out, in this district.

27 / / /

28 / / /

**Class Action Complaint**                                                     4

**PARTIES**

### A.    Plaintiff

9.    Plaintiff Judah M. Feigenbaum is a citizen of the State of New York. Plaintiff purchased Passenger Air Transportation and paid Fuel Surcharges thereon from a Defendant during the class period and has suffered pecuniary injury as a result of the antitrust violations alleged herein.

### B.    Defendants

10.    Defendant **Air New Zealand** is a New Zealand company with its principal place of business at Quay Tower, 29 Customs St. West, Auckland, 1020, New Zealand. Air New Zealand conducts Passenger Air Transportation throughout the world, including into the U.S. and especially California.

11.    Defendant **All Nippon Airways** is a Japanese company with its principal place of business at Shidome-City Center, 1-5-2, Higashi-Shimbashi, Minato-ku, Tokyo 105-7133, Japan.  All Nippon Airways conducts Passenger Air Transportation throughout the world, including into the U.S. and especially California.

12.    Defendant **Cathay Pacific Airways** is a Hong Kong-based company with its principal place of business at 9 Connaught Road, Central Swirel Housepox Box 1 GPO, Hong Kong K3.  Cathay Pacific Airways conducts Passenger Air Transportation throughout the world, including direct transpacific flights into the United States, especially California.

13.    Defendant **China Airlines** is a Taiwanese company with its principal place of business at 131 Nanking E Rd., Section 3, Taipei, Taiwan.  China Airlines conducts Passenger Air Transportation throughout the world, including direct transpacific flights into the United States, especially California.

14.    Defendant **EVA Airways** is a Taiwanese company with its principal place of business at 16F.-1, No. 207, Fusing Road, Taoyuan City, Taoyuan County, Taiwan. EVA Airways conducts Passenger Air Transportation throughout

1   the world, including direct transpacific flights into the United States, especially
2   California.

3       15.    Defendant **Japan Airlines International** is a Japanese company with
4   its principal place of business at 4-11, Higashi-Shinagawa 2-chrome,
5   Shinagawa-Ku, Tokyo 140-8605, Japan. Japan Airlines International conducts
6   Passenger Air Transportation throughout the world, including into the United
7   States, especially California.

8       16.    Defendant **Malaysia Airlines** is a Malaysian corporation with its
9   principal place of business at MAS Complex A, Sultan Abdul Azia Shah Airport,
10  47200 Suband, Selangor Darui Ehsan, Malaysia. Malaysia Airlines conducts
11  Passenger Air Transportation throughout the world, including into the United
12  States, especially California.

13      17.    Defendant **Northwest Airlines** is a Delaware corporation with its
14  principal place of business at 2700 Lone Oak Parkway, Eagan, MN 55121.
15  Northwest Airlines conducts Passenger Air Transportation throughout the world,
16  including into the United States, especially California.

17      18.    Defendant **Qantas Airways** is an Australian company with its
18  principal place of business at 203 Coward Street, Qantas Centre, Mascot NSW
19  2020 C3. Qantas Airways conducts Passenger Air Transportation throughout the
20  world, including into the United States, especially California.

21      19.    Defendant **Singapore Airlines** is a Singapore company with its
22  principal place of business at Airline House, 25 Airline Road, 819829 Singapore.
23  Singapore Airlines conducts Passenger Air Transportation throughout the world,
24  including direct transpacific flights into the United States, especially California.

25      20.    Defendant **Thai Airways** is a Thailand company with its principal
26  place of business at 89 Vibhavadi-Rangsit Road, Bangkok, Thailand 10900. Thai
27  Airways conducts Passenger Air Transportation throughout the world, including
28  direct transpacific flights into the United States, especially California.

**Class Action Complaint**                                                    6

1    21.    Defendant **United Airlines** is a Delaware corporation with its
2 principal place of business at 77 W. Wacker, Chicago, IL 60601. United Airlines
3 is one of the largest passenger airlines in the world with more than 3,600 flights a
4 day to more than two hundred destinations. United Airlines conducts Passenger
5 Air Transportation throughout the world, including into the United States,
6 especially San Francisco International Airport, where United Airlines operates a
7 hub and maintenance operation center. United Airlines is the largest employer in
8 San Mateo County, California, which is located within this district.

9            **C.    Unnamed Co-Conspirators and Agents**

10    22.    At all relevant times, other airlines, trade groups, or other entities,
11 willingly conspired with Defendants in their unlawful restraint of trade. All
12 averments herein against named Defendants are also averred against these
13 unnamed co-conspirators as though set forth at length. The acts alleged to have
14 been done by Defendants were authorized, ordered or done by their directors,
15 officers, agents, employees, or representatives while actively engaged in the
16 management of each of the Defendants' affairs.

17                        **TRADE AND COMMERCE**

18    23.    Throughout the Class Period, there was a continuous and
19 uninterrupted flow of Passenger Air Transportation in international commerce
20 throughout the United States and especially into and out of Los Angeles and San
21 Francisco. Defendants' unlawful activities, as described herein, took place within
22 the flow of commerce to Passenger Flight customers throughout the world, and
23 had a direct, substantial and reasonably foreseeable effect upon interstate and
24 international commerce in the United States.

25                        **CLASS ACTION ALLEGATIONS**

26    24.    Plaintiff brings this action as a class action pursuant to Federal Rules
27 of Civil Procedure 23(a) and 23(b)(3) on behalf of the following Class:
28 / / /

**Class Action Complaint**                                                                                    7

All individuals or entities (excluding governmental entities, Defendants, and their parents, predecessors, subsidiaries, affiliates, and their co-conspirators) who purchased air passenger transportation, for transpacific flights and who paid a fuel surcharge on their tickets from any of the Defendants and their co-conspirators or any predecessor, subsidiary, or affiliate of each, at any time during the period from January 2004 through September 2007.

25.    Because such information is in the exclusive control of Defendants, Plaintiff does not know the exact number of Class members. Due to the nature of the trade and commerce involved, however, Plaintiff believes that Class members number at least in the thousands and are sufficiently numerous and geographically dispersed throughout the United States and the world so that joinder of all Class members is impracticable. It is estimated that there were more than 15 million passengers traveling to the Pacific out of California in 2006.

26.    There are questions of law or fact common to the Class, including:

a.    Whether Defendants engaged in a combination or conspiracy among themselves to fix, raise, maintain, and/or stabilize transpacific air passenger transportation and fuel surcharge prices charged effecting commerce in the United States and throughout the world;

b.    The duration of the conspiracy alleged in this Complaint and the nature and character of the acts performed by Defendants in furtherance of the conspiracy;

c.    Whether the alleged conspiracy violated Section 1 of the Sherman Act;

d.    Whether the conduct of Defendants, as alleged in this Complaint, caused injury to the businesses or property of Plaintiff and the other members of the Class;

e.    The effect of Defendants' conspiracy on the Passenger Air Transportation and Surcharge prices charged in the United States and throughout the world during the Class Period; and

**Class Action Complaint**                                                                8

f.    The appropriate measure of damages sustained by Plaintiff and other Class members.

27.    Plaintiff is a member of the Class. Plaintiff's claims are typical of the claims of the Class members. Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff purchased Passenger Air Transportation and Surcharges from one or more Defendants, and their interests are coincident with and not antagonistic to those of other members of the Class. Plaintiff is represented by counsel competent and experienced in the prosecution of antitrust and class action litigation.

28.    The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members.

29.    A class action is superior to other methods for the fair and efficient adjudication of this controversy. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender.

30.    Class treatment will also permit the adjudication of relatively small claims by many Class members who otherwise could not afford to litigate an antitrust claim such as is asserted in this Complaint.

31.    This class action presents no difficulties in management that would preclude maintenance as a class action. Finally, the Class is readily definable and is one for which records of the names and addresses of the members of the Class exist in the files of Defendants.

## FACTUAL ALLEGATIONS MARKET

32.    Defendants controlled a vast majority of the Passenger Flight services during the Class Period with their dominant combined market share. Passenger Flight customers were unable to shop for Passenger Air Transportation from other

1  carriers during that period, because of the lack of competition which allowed
2  Defendants to reap enormous profits from the Fuel Surcharges.

3      33.    In addition, Fuel Surcharges were often treated by Defendants and
4  other carriers similar to a tax or other surcharge, such as an airport facility charge
5  or a government mandated September 11 security charge. As such, Fuel
6  Surcharges were not always advertised as part of Defendants' fares, and were
7  added on to the base fare as part of the purchase transaction.

8      34.    Because surcharges generally are designed to compensate for
9  increased external costs, they should bear a relatively constant relationship to
10 external cost levels. Thus, in a competitive market, Fuel Surcharges should rise
11 and fall at relatively constant ratios to the associated jet fuel costs. Since their
12 inception in 2004, the ratio of Defendants' Surcharges to external costs has
13 increased steadily. The Fuel Surcharges bore no relationship to the Defendants'
14 actual fuel costs or fuel cost increases.

15     35.    The ratio of Defendants' profits to external costs was therefore quite
16 high due to the concerted implementation and maintenance of the agreed-upon
17 Passenger Air Transportation and Fuel Surcharge price levels. So despite
18 increased fuel costs during the Class Period, Defendants' Surcharges were actually
19 responsible for outstanding profit growth for Defendants beyond record fuel costs.

20              **DEFENDANTS AND THE PASSENGER FLIGHT MARKET**

21     36.    Each Defendant possesses significant market share on their routes of
22 travel. The principal competitors for the Defendants in the transpacific long haul
23 Passenger Air Transportation market are therefore one another.

24     37.    Passenger Air Transportation is a commodity product that is fungible
25 in the sense that Passenger Air Transportation provided by any one airline is
26 readily substitutable for the Passenger Air Transportation provided by any other
27 airline.

28 / / /

1    38.    Passenger Air Transportation is a homogenous service sold by
2  airlines, including Defendants, to airline customers, including Plaintiff and the
3  members of the Class, primarily based on price.

4    39.    The Passenger Air Transportation market in the United States and
5  worldwide is highly concentrated, and there exists substantial barriers to entry in
6  this market; both factors facilitate the implementation and maintenance of a
7  horizontal price-fixing cartel such as that perpetrated by Defendants and alleged
8  herein.

9    40.    Generally, surcharges are a feature of the global air transportation
10  market, in which airlines charge extra fees to their customers, above and beyond
11  basic flight rate charges, with the intent of defraying certain external costs of the
12  carriers.

13    41.    Beginning in 2004, Defendants agreed to act in concert with one
14  another in demanding the Surcharges to defray fuel costs and agreeing when and
15  how much to increase the Surcharges to their Passenger Flight customers.

16    42.    Defendants were aware that their imposition of Fuel Surcharges and
17  other surcharges would not be successful if their supposed competitors did not join
18  them; otherwise, customers would be free to seek out lower prices. For this
19  reason, Defendants entered into agreements to raise surcharges at the same times
20  and in the same amounts.

21    43.    But for Defendants' Passenger Air Transportation conduct,
22  Defendants would have been unable to perpetrate the extent to which they
23  increased the prices of their Fuel Surcharges.

24    44.    The collusion of Japan Airlines International and All Nippon Airways
25  ("ANA") is representative of the behavior of the other Defendants. Japan Airlines
26  International and ANA agreed to raise and lower fares on nearly always the same
27  dates and were in lockstep on surcharges for transpacific fares:
28  / / /

1  June 8, 2004, ANA notices the

2  Japanese government to raise IATA

3  international fares, in the wake of

4  increased fuel prices, to and from

5  Japan, effective **July 1**, 5% hike,

6  exception North America economy

7  fares, but not business class.

8

9  January 5, 2005, ANA announces it

10  will add fuel surcharges on

11  international fares on **February 1**.

12  The surcharges for transpacific flights

13  were 2,500 yen.

14

15  June 3, 2005, Japan Airlines files a

16  notice with the Japanese government

17  to raise its international fuel

18  surcharge effective **July 1**.

19

20  January 16, 2006, Japan Airlines files

21  a notice with the Japanese

22  government to raise its international

23  fuel charge effective **March 1**.

24

25

26

27

28

June 8, 2004, Japan Airlines files a
notice with the Japanese government
to raise international fares, in the
wake of increased fuel prices, to and
from Japan, effective **July 1**, 5% hike,
exception North American economy
fares, but not business class.

January 20, 2005, Japan Airlines
announces it will add fuel surcharges
on international passenger fares on
**February 1**. The surcharges for
transpacific flights were 2,500 yen.

June 7, 2005, ANA files a notice with
the Japanese government to raise its
international fuel surcharge effective
**July 7**.

January 23, 2006, ANA files a notice
with the Japanese government to raise
its international fuel surcharge,
effective **March 1**.

August 17, 2006, Japan Airlines files a notice with the Japanese government to raise its international fuel surcharge, effective **October 1**, from 8,000 yen to 13,600 yen ($66 to $113).

August 31, 2006, ANA files a notice with the Japanese government to raise its international fuel surcharge, effective **October 15**, from 8,000 yen to 13,600 yen ($66 to $113).

November 16, 2006, Japan Airlines files a notice with the Japanese government to reduce the fuel surcharge on international passenger fares effective **January 1**, lowering the surcharge from 13,600 yen to 13,000 yen ($113 to $108).

November 16, 2006, ANA files a notice with the Japanese government to reduce the fuel surcharge on international passenger fares effective **January 1**, lowering the surcharge from 13,600 yen to 13,000 yen ($113 to $108).

March 19, 2007, Japan Airlines files a notice with the Japanese government to reduce the fuel surcharge on international passenger fares effective **May 1**, to 11,000 yen or $91.

March 20, 2007, ANA files a notice with the Japanese government to reduce the fuel surcharge on international passenger fares effective **May 1**, to 11,000 yen or $91.

May 15, 2007, Japan Airlines files a notice with the Japanese government to raise the fuel surcharge on international passenger fares effective **July 1**, from 11,000 yen or $91 to 12,000 yen or $100.

May 25, 2007, ANA files a notice with the Japanese government to raise the fuel surcharge on international passenger fares effective **July 10**, from 11,000 yen or $91 to 12,000 yen or $100.

| | |
|---|---|
| 1 August 15, 2007, Japan Airlines files | August 20, 2007, ANA files a notice |
| 2 a notice with the Japanese | with the Japanese government to raise |
| 3 government to raise the fuel | the fuel surcharge on international |
| 4 surcharge on international passenger | passenger fares effective **October 1**, |
| 5 fares effective **October 1**, from | from 12,000 yen or $100 to 13,000 |
| 6 12,000 yen or $100 to 13,000 yen or | yen or $108. |
| 7 $108. | |

8

9 Other defendants did likewise. United Airlines, for example, charged a surcharge
10 in line with Japan Airlines International and All Nippon Airways as evidenced by
11 the following ticket. From July 10, 2007 to October 1, 2007 Japan Airlines
12 International and All Nippon Airways had their fuel surcharge on international
13 passenger fares transpacific set at 12,000 yen or $100. The United ticket for
14 August 16, 2007 shows the surcharge fare, marked YQ, at $100.

15 **TRADE ORGANIZATIONS**

16   45.    Defendants' executives, as well as other air carriers' executives, met
17 formally or informally over the years at various trade meetings or meetings of
18 trade associations, such as the International Air Transport Association, the
19 Association of Asian Pacific Airlines, oneworld, Star Alliance and SkyTeam
20 Alliance. At one or more of these meetings Defendants conspired to artificially
21 inflate fuel Surcharges on international passenger air transportation. Ten of the
22 defendants are members of AAPA.

23   46.    Another key to the conspiracy is the Geneva-based International Air
24 Transport Association. All of the defendants are members of the IATA, which
25 was founded in 1945 in Havana, Cuba. IATA represents more than 240 airlines
26 comprising 94% of scheduled international air traffic.    AAPA was formed
27 during a meeting of Asian airline executives in 1965 to discuss regional
28 cooperation. The following year, Philippine Airlines, China Airlines, Korean

---

**Class Action Complaint**                                                                  14

1  Airlines and Malaysian Airlines officially formed the Orient Airlines Research
2  Bureau, which in 1996 became the Association of Asia Pacific Airlines.

3  47.    Alliance memberships by airline:

4  **Air New Zealand**

5  o   Member of the Association of Asia Pacific Airlines.

6  o   Member of the Star Alliance.

7  o   Member of the International Air Transport Association.

8  **All Nippon Airways**

9  o   Member of the Association of Asia Pacific Airlines.

10  o   Member of the Star Alliance.

11  o   Member of the International Air Transport Association.

12  **American Airlines**

13  o   Member of Oneworld.

14  o   Member of the International Air Transport Association.

15  **Cathay Pacific Airways**

16  o   Member of the Association of Asia Pacific Airlines.

17  o   Member of oneworld.

18  o   Member of the International Air Transport Association.

19  **China Airlines**

20  o   Member of the Association of Asia Pacific Airlines.

21  o   Member of the International Air Transport Association.

22  **EVA Airlines**

23  o   Member of the Association of Asia Pacific Airlines.

24  o   Member of the International Air Transport Association.

25  **Japan Airlines International**

26  o   Member of the Association of Asia Pacific Airlines.

27  o   Member of oneworld.

28  o   Member of the International Air Transport Association.

**Malaysia Airlines**

    o    Member of the Association of Asia Pacific Airlines.

    o    Member of the International Air Transport Association.

**Northwest Airlines**

    o    Member of the SkyTeam Alliance.

    o    Member of the International Air Transport Association.

**Qantas Airways**

    o    Member of the Association of Asia Pacific Airlines.

    o    Member of oneworld.

    o    Member of the International Air Transport Association.

**Singapore Airlines**

    o    Member of the Association of Asia Pacific Airlines.

    o    Member of the Star Alliance.

    o    Member of the International Air Transport Association.

**Thai Airways**

    o    Member of the Association of Asia Pacific Airlines.

    o    Member of the Star Alliance.

    o    Member of the International Air Transport Association.

**United Airlines**

    o    Member of the Star Alliance.

    o    Member of the International Air Transport Association.

48.    Various defendants are in effect business partners with each other through what is called code sharing. Code sharing is a business term which was first originated in 1990 when Qantas Airways and American Airlines combined services between an array of U.S. and Australian cities. Code sharing is a legal business arrangement. However, it provides a mechanism to conduct illegal activity.

49.    A code share is part of a "cooperative services" agreement between the two carriers. It refers to the practice where a flight operated by an airline is jointly marketed as a flight for one or more other airlines. Most major airlines today have code sharing partnerships with other airlines.

50.    The following are the code sharing partnerships of the defendants listed alphabetically:

Air New Zealand / EVA Airways

Air New Zealand / Qantas (Tasman route)

Air New Zealand / Japan Airlines International

Air New Zealand / Northwest Airlines

Air New Zealand / Singapore Airlines

Air New Zealand / Thai Airways

Air New Zealand / United Airlines

All Nippon Airways / Asiana Airlines

All Nippon Airways / EVA Airways

All Nippon Airways / Malaysia Airlines

All Nippon Airways / Singapore Airlines

All Nippon Airways / United Airlines

China Airlines / American Airlines

Cathay Pacific Airways / American Airlines

Cathay Pacific Airways / Japan Airlines International

China Airlines / Thai Airways

EVA Airways / Air New Zealand

EVA Airways / American Airlines

EVA Airways / All Nippon Airways

EVA Airways / Qantas

EVA Air / American Airlines

Japan Airlines International / Air New Zealand

| | |
|---|---|
| 1 | Japan Airlines International / American Airlines |
| 2 | Japan Airlines International / Cathay Pacific |
| 3 | Japan Airlines International / Korean Air |
| 4 | Japan Airlines International / Northwest Airlines |
| 5 | Japan Airlines International / Qantas Airlines |
| 6 | Japan Airlines International / Singapore Airlines |
| 7 | Japan Airlines International / Thai Airways |
| 8 | Malaysia Airlines / All Nippon Airways |
| 9 | Malaysia Airlines / Thai Airways |
| 10 | Northwest Airlines / Air New Zealand |
| 11 | Northwest Airlines / Asiana Airlines |
| 12 | Northwest Airlines / Japan Airlines International |
| 13 | Northwest Airlines / Korean Air |
| 14 | Qantas Airways / Air New Zealand |
| 15 | Qantas Airways / American Airlines |
| 16 | Qantas Airways / EVA Airways |
| 17 | Qantas Airways / Japan Airlines International |
| 18 | Singapore Airlines / Air New Zealand |
| 19 | Singapore Airlines / Asiana Airlines |
| 20 | Singapore Airlines / All Nippon Airways |
| 21 | Singapore Airlines / Malaysian Airlines |
| 22 | Singapore Airlines / United Airlines |
| 23 | Thai Airways / Air New Zealand |
| 24 | Thai Airways / China Airlines |
| 25 | Thai Airways / Japan Airlines International |
| 26 | Thai Airways / Malaysia Airlines |
| 27 | Thai Airways / United Airlines |
| 28 | United Airlines / Air New Zealand |

1             United Airlines / All Nippon Airways

2             United Airlines / Asiana Airlines

3             United Airlines / Singapore Airlines

4             United Airlines / Thai Airways

5      51.  Over the years, executives of Defendant airlines have attended

6  numerous meetings where cartel-like activity was accomplished. Here are a few

7  examples of meetings where executives discussed and agreed on fuel surcharges:

8         **The International Air Transport Association, Special Meeting,**

9  **Geneva, May 28, 2004.** Fuel costs were the main topic of this meeting and there

10  were agreements on how to add surcharges for fuel. The Montreal Gazette

11  reported on June 1, 2004, that "member carriers of the International Air Transport

12  Association might raise international fares by as much as five percent to help

13  cover a surge in jet fuel costs. The proposed fare increase of between two percent

14  and five percent was agreed at a May 28 meeting of the association, which

15  represents more than 270 airlines worldwide, an IATA spokesperson said."

16         **The International Air Transport Association Annual General**

17  **Meeting and World Air Transport Summit, Singapore, June 6-8, 2004.** More

18  than 600 airline executives attended this annual summit. Giovanni Bisignani,

19  IATA CEO said in a welcoming statement, "While record high fuel prices

20  challenge our profitability it is time to put our efforts toward rebuilding the

21  industry." Immediately following this meeting on June 8, 2004 both Japan

22  Airlines International and All Nippon Airways filed applications with the Japanese

23  government to raise international passenger fares because of high fuel costs. In a

24  news release announcing the Fuel Surcharge hike, Japan Airlines International

25  said:

26    ///

27    ///

28

**Class Action Complaint**          19

1
2
3
4
5
6

> **"The application follows a special meeting of the**
> **members of the International Air Transport**
> **Association in Geneva, May 28, (2004) when a**
> **resolution was discussed to raise fares in the wake of**
> **increased fuel prices. This resolution has now been**
> **adopted."**

7    Japan Airlines International and All Nippon Airways were in lockstep on June 8,
8    2004, both announcing on that day that a five percent fuel Surcharge would be go
9    into effect, on the same day for both airlines, July 1, 2004.

10    **2005 International Flight Services Association, Global Leadership**
11    **Conference - Asia Pacific, August 30 - September 1, 2005 Tokyo Japan:** This
12    meeting was labeled as "The Challenge of Change." Among the participants
13    were, Makoto Fukada, Managing Director and Senior Vice President International
14    Passenger, Japan Airlines; Sandra Pineau, Senior Director of Planning and Design,
15    Continental Airlines; Charles Grossrieder, a manager at Cathay Pacific Airways;
16    Nikom Raviyan, Vice President, Thai Airways; Sandeep Bahl, General Manager,
17    Northwest Airlines, Shigeru Miyata, Vice President, Japan Airlines; Kriengsakdi
18    Phatharacharukul, Director, Thai Airways; and Hee Won Jo, Senior Manager,
19    Asiana Airlines.

20    **2nd Annual Asia Pacific & Middle East Aviation Outlook Summit**
21    **2006, December 5-6, 2005 Kuala Lumpur, Malaysia:** The theme of this
22    meeting was "Towards Best Practice; Maximising Revenues and Minimising
23    Costs." On the first day of the meeting, the guests included Dato Seri Bashir
24    Ahmad, Malaysia Airport's CEO; Willy Boulter, Commercial Director for Virgin
25    Atlantic Airways; and Stanley Kuppusamy, President, International Relations,
26    Singapore Airlines. Fuel surcharges were a topic of discussion.

27    **Aviation Emergency Response 2006, AAPA sponsored,**
28    **September 19-21, 2006 Bangkok, Thailand:** This meeting was attended by

---

1  international airport officials and AAPA member executives.  Meetings were held
2  on increasing revenues in the transpacific area by way of Fuel Surcharges and
3  other financial means.

4          **3rd Annual Asia Pacific & Middle East Aviation Outlook**
5  **Summit, November 9-10, 2006 Singapore:** Participating in this meeting were
6  executives from most of the Defendant airlines, including Geoff Dixon, CEO of
7  Qantas and Huang Cheng Eng, Executive VP for Singapore Airlines.  One of the
8  issues presented and discussed was "Fighting Costs: Fuel prices and managing risk
9  exposure."

10         **AAPA Forum, November 28-29, 2006 Bandar Seri Begawan,**
11 **Brunei Darussalam:** More than 120 aviation industry stakeholders attended this
12 meeting, organized by AAPA.  At this meeting, Defendants and others discussed
13 surcharges.

14         **Asia Pacific Aviation Summit, July 24-25, 2007 Sydney,**
15 **Australia:** This meeting was put on by the Asia Pacific aviation industry.  Some
16 of the issues discussed included the impact of the investigation by the U.S.
17 Department of Justice into fare price fixing.  Another topic was  "working together
18 efficiently" to diffuse the investigation of added surcharges.

19         52.    The U.S. Department of Justice ("DOJ") started investigating air
20 passenger fuel surcharge conspiracies worldwide in 2006, particularly transatlantic
21 routes and transpacific routes to and from the West Coast.  The DOJ announced on
22 August 1, 2007 a $300 million settlement with British Airways and it cited
23 passenger transatlantic routes.  In its news release, the DOJ said: "The Department
24 also charged that between August 2004 and February 2006, British Airways
25 engaged in a conspiracy to suppress and eliminate competition by fixing the Fuel
26 Surcharge charged to passengers on long-haul international flights, including
27 flights between the United States and the United Kingdom."

28

**Class Action Complaint**                                                    21

1    53.    The DOJ also focused on transpacific flights to and from the United
2  States, noting that investigation is "ongoing" and includes other Defendants
3  named herein.

4    54.    The DOJ also announced a settlement with Korean Air for fare price
5  fixing on flights from the United States to Korea. The DOJ stated that Korean Air
6  has "agreed to cooperate with the Department's ongoing investigation." Korean
7  Air's unnamed co-conspirator in the passenger fare price fixing via Fuel
8  Surcharges was widely reported to be Asiana Airlines, which sought amnesty.

9    55.    Under the Antitrust Criminal Penalty Enhancement and Reform Act
10 of 2004, a company can apply for leniency from the Department of Justice for its
11 participation in antitrust activities. Under the so-called Corporate Leniency
12 Program, if a company comes forward with information about antitrust activities
13 and cooperates in the investigation, it is eligible for conditional amnesty from
14 prosecution.

15    56.    Both Korean Air and Asiana Airlines are among the top transpacific
16 carriers in the world. It was not the first time Korean Air and Asiana Airlines have
17 been implicated in collusion and anticompetitive behavior. The Korean Fair Trade
18 Commission fined Korean Air and Asiana in 2001 for conspiring to set passenger
19 air transportation services in Korea.

20    57.    In addition, several of the Defendants and unnamed co-conspirators
21 have been identified as targets and or subjects in international investigations by
22 the U.S. Department of Justice and the European Union into air cargo fuel
23 surcharge price fixing. The targets, many of which are also named in civil suits,
24 include Defendant All Nippon Airways, Defendant American Airlines, Asiana
25 Airlines, Defendant Japan Airlines, Korean Airlines, Defendant Northwest
26 Airlines, Defendant Qantas Airways and Defendant United Airlines. In both the
27 air passenger and cargo investigations, Defendants and other airlines are accused
28

**Class Action Complaint**                                                22

1 | of developing and participating in conspiracies to increase revenue by assessing
2 | inflated Fuel Surcharges.

3 | **ADMISSIONS BY CO-CONSPIRATORS**

4 |     58.   On August 13, 2007, Qantas Chief Executive Officer Geoff Dixon
5 | announced that Qantas Airways would set aside \$40 million to cover a potential
6 | fine in the United States as a result of Fuel Surcharges and price fixing in its
7 | freight division. In a news release, Dixon was quoted as saying:

8 |     "On 1 August 2007, the U.S. Department of Justice
9 |     announced that British Airways and Korean Air had
10 |     agreed to plead guilty and pay separate US\$300 million
11 |     criminal fines for their roles in conspiracies to fix prices
12 |     of passenger and cargo flights. British Airways
13 |     subsequently announced that US\$200 million of its fine
14 |     related to cargo. Based on these developments, a
15 |     decision has been made to make a US\$40 million (A\$47
16 |     million) provision in the 2006/07 Financial Accounts."
17 | Dixon also was quoted as saying:

18 |     "We have investigated this issue thoroughly and are
19 |     confident that the unacceptable conduct was limited to a
20 |     small number of people."

21 |     59.   On October 6, 2007, the Japanese daily newspaper Asahi Shimbun
22 | reported that Japan Airlines International would book a roughly \$171 million
23 | charge for potential fines from a global price fixing probe by U.S. and European
24 | Union officials. The newspaper said:

25 |     "The company's move comes after the U.S. Justice
26 |     Department fined British Airways PLC and Korean Air
27 |     Lines Co. \$300 million each in August for fixing the
28 |     prices of passenger and cargo flights with other airlines.

1  |  The companies allegedly conspired to set fuel surcharges
2  |  when oil prices rose."

3  |  ## FRAUDULENT CONCEALMENT

4  |  60.    Throughout the relevant period, Defendants affirmatively and
5  |  fraudulently concealed their unlawful conduct from Plaintiff and the Class.

6  |  61.    Plaintiff and the members of the Class did not discover, and could not
7  |  discover through the exercise of reasonable diligence, that Defendants were
8  |  violating the antitrust laws as alleged herein until shortly before this litigation was
9  |  commenced. Nor could Plaintiff and the members of the Class have discovered
10 |  the violations earlier than that time because Defendants conducted their
11 |  conspiracy in secret, concealed the nature of their unlawful conduct and acts in
12 |  furtherance thereof, and fraudulently concealed their activities through various
13 |  other means and methods designed to avoid detection. The conspiracy was by its
14 |  nature self-concealing.

15 |  62.    Plaintiff and the members of the Class could not have discovered the
16 |  unlawful conduct at an earlier date through the exercise of reasonable diligence
17 |  because of Defendants' active and purposeful concealment of their unlawful
18 |  activities.

19 |  63.    Defendants engaged in a successful, illegal price-fixing conspiracy
20 |  with respect to Surcharges and other fees, which they affirmatively concealed, in
21 |  at least the following respects:

22 |  a.    By agreeing among themselves not to discuss publicly, or
23 |  otherwise reveal, the nature and substance of the acts and communications in
24 |  furtherance of their illegal scheme;

25 |  b.    By engaging in secret meetings and telephone calls in order to
26 |  further their illicit Passenger Air Transportation and Fuel Surcharges cartel; and/or

27 |  c.    By giving false and pretextual reasons for their pricing for
28 |  Passenger Air Transportation and Fuel Surcharges thereon, and their increases,

**Class Action Complaint**                                                                  24

1 during the relevant period and by describing such pricing and increases falsely as
2 being the result of external costs rather than collusion.

3     64.   As a result of Defendants' fraudulent concealment of their conspiracy,
4 Plaintiff and the Class assert the tolling of any applicable statute of limitations
5 affecting the rights of action of Plaintiff and the members of the Class.

6                           **COUNT I**

7     65.   During the Class Period Defendants engaged in a continuing
8 agreement, understanding, and conspiracy in restraint of trade to artificially fix,
9 maintain, and/or stabilize the prices of Passenger Air Transport and Fuel
10 Surcharges in the United States and throughout the world in violation of Section 1
11 of the Sherman Act, 15 U.S.C. § 1.

12     66.   In formulating and effectuating the alleged contract, combination, or
13 conspiracy, Defendants engaged in anti-competitive activities, the purpose and
14 effect of which were to artificially raise, fix, maintain, and/or stabilize the prices
15 of Passenger Air Transport and Fuel Surcharges. These activities included the
16 following:

17           a.   agreeing to charge prices of Passenger Air Transport and Fuel
18 Surcharges at certain levels and otherwise to fix, raise, maintain, and/or stabilize
19 the prices of Passenger Air Transport and Fuel Surcharges charged in the United
20 States and throughout the world;

21           b.   charging Passenger Air Transport and Fuel Surcharges at the
22 agreed-upon rates;

23           c.   signaling increases in the price of Passenger Air Transport and
24 Fuel Surcharges by, inter alia, publicly announcing their increases;

25           d.   moving prices of their Passenger Air Transport and Fuel
26 Surcharges in lockstep; and

27           e.   announcing new Passenger Air Transport and Fuel Surcharges
28 prices nearly simultaneously or within days of each other.

**Class Action Complaint**                                         25

1  67.   During the Class Period, the Defendants increased, as a ratio to
2  external costs - and profits - the Passenger Air Transport and Fuel Surcharges they
3  charged.  These increases in Passenger Air Transport and Fuel Surcharges cannot
4  be explained by actual increases in fuel prices or supply/demand forces, but rather
5  were the result of anticompetitive conduct.

6  68.   During the Class Period, Plaintiff and members of the Class
7  purchased Passenger Air Transportation directly from Defendants (or their agents,
8  subsidiaries, and/or controlled affiliates).

9  69.   The illegal combination and conspiracy alleged herein has had the
10  following effects, among others:

11       a.   Price competition in the pricing of Passenger Air
12  Transportation and Fuel Surcharges thereon has been restrained, suppressed,
13  and/or eliminated;

14       b.   Price competition in the contracting of Passenger Air
15  Transportation has been restrained, suppressed, and/or eliminated;

16       c.   Prices for Passenger Air Transportation and Fuel Surcharges
17  thereon charged by Defendants have been fixed, raised, maintained, and/or
18  stabilized at artificially high, non-competitive levels; and

19       d.   Members of the Class have been deprived of the benefit of free
20  and open competition.

21                          **COUNT II**

22  70.   Plaintiff incorporates by reference the allegations in the above
23  paragraphs as if they were fully set forth herein.

24  71.   Defendants benefited from their unlawful acts through the receipt of
25  improperly obtained monies either directly or indirectly from plaintiff and other
26  class members.  It would be inequitable for defendants to be permitted to retain the
27  benefit of these monies, which were conferred by plaintiff and members of the
28  class and retained by defendants.

**Class Action Complaint**                                    26

1    72.    Plaintiff and members of the class are entitled to the establishment of

2  a constructive trust consisting of the benefits to defendants of, or as the result of

3  such overpayments, from which plaintiff and other class members may make

4  claims.

5    73.    During the Class Period, Plaintiff and the members of the Class,

6  because of Defendants' antitrust violations, paid Surcharges and other fees they

7  would not have paid absent such violations.

8    74.    As a result, Plaintiff and the members of the Class it seeks to

9  represent have been injured and damaged in their business and property in an

10  amount to be determined according to proof.

11    75.    As a direct and proximate result of the illegal conspiracy, Plaintiff

12  and the members of the Class have been injured and financially damaged in their

13  respective businesses and property, in that they have paid Surcharges and other

14  fees during the Class Period they would not have paid in the absence of the illegal

15  conspiracy.

16                              **PRAYER FOR RELIEF**

17    WHEREFORE, Plaintiff prays that:

18    A.    The Court determine that this action may be maintained as a

19  class action under Rule 23(a) and (b) (3) of the Federal Rules of Civil Procedure;

20    B.    The Court adjudge and decree that the contract, combination

21  and conspiracy alleged herein is a per se unreasonable restraint of trade in

22  violation of Section 1 of the Sherman Act;

23    C.    Judgment be entered against Defendants, jointly and severally,

24  and in favor of Plaintiff and the Class for damages as allowed by law as

25  determined to have been sustained by them;

26    D.    Each of the Defendants, successors, assigns, parents,

27  subsidiaries, affiliates and transferees, and their respective officers, directors,

28  agents and employees, and all other persons acting or claiming to act on behalf of

---

**Class Action Complaint**                                                    27

1   Defendants or in concert with them, be permanently enjoined and restrained from,

2   in any manner, directly or indirectly, continuing, maintaining or renewing the

3   combinations, conspiracy, agreement, understanding or concert of action, or

4   adopting any practice, plan, program or design having a similar purpose or effect

5   in restraining competition;

6         E.    The Court award Plaintiff and the Class attorneys' fees and

7   costs, and pre-judgment and post-judgment interest as permitted by law; and

8         F.    The Court award Plaintiff and the Class such other and further

9   relief as may be necessary and appropriate.

10

## JURY TRIAL DEMAND

11        Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands

12   a trial by jury of all of the claims asserted in this Complaint so triable.

13

14   DATED: January 15, 2008       **POMERANTZ HAUDEK BLOCK**
                              **GROSSMAN & GROSS LLP**

15

16

17

18                           By: _Cheryl Hamer Mackell_

19                           Cheryl Hamer Mackell, Esq. (112933)
                          840 Malcolm Road

20                           Burlingame, CA 94010
                          Burlingame, CA 94010

21                           Telephone: (415) 241-1480
                          Facsimile: (800)211-5422

22

23                           Michael M. Buchman, Esq.
                          J. Douglas Richards, Esq.

24                           **POMERANTZ HAUDEK BLOCK**
                        **GROSSMAN & GROSS LLP**

25                           100 Park Avenue
                          New York, New York 10019

26                           Telephone: (212) 661-1100
                          Facsimile: (212) 661-8665

27

28